**INTERNATIONAL EATERIES OF AMERICA, INC., Plaintiff–Appellant,**

v.

**BROWARD COUNTY, FLORIDA, Defendant–Appellee.**

No. 90–5076.

United States Court of Appeals, Eleventh Circuit.

Sept. 12, 1991.

Richard L. Wilson, Orlando, Fla., for plaintiff-appellant.

Tracy Lautenschlager, Ft. Lauderdale, Fla., for defendant-appellee.

Before KRAVITCH and COX, Circuit Judges, and HENDERSON, Senior Circuit Judge.

KRAVITCH, Circuit Judge:

Appellant International Eateries of America, Inc. challenges Broward County, Florida's adult entertainment zoning ordinances as violative of the first amendment. Because we hold that the ordinances satisfy the standard set out by the Supreme Court in *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986), we reject International Eateries' challenge and affirm the decision of the district court.

I

International Eateries operates a nightclub known as "Thee Dollhouse III" in unincorporated Broward County, Florida. The parties have stipulated that the primary form of entertainment at Thee Dollhouse III is non-obscene nude dancing. In April 1986, appellee Broward County served two notices of violation upon International Eateries, informing it that Thee Dollhouse III was operating in violation of several Broward County zoning ordinances. The first notice stated that Thee Dollhouse III was in violation of the County's distance ordinances, which prohibit the location of adult nightclubs within 500 feet of a residential district and 1000 feet of a church. The second notice stated that Thee Dollhouse III was in violation of the County's special uses ordinances, which permit operation of adult nightclubs only within a special zoning district. It is undisputed that Thee Dollhouse III is within 500 feet of a residential district and that three residential properties are less than 500 feet away. It is also undisputed that a church is located approximately 885 feet from Thee Dollhouse III. Finally, it is undisputed that Thee Dollhouse III is not within the special uses zoning district.

International Eateries filed an action in federal district court seeking to enjoin the County from enforcing the ordinances. The district court stayed the proceedings until International Eateries had pursued administrative remedies with the County. International Eateries then applied to the County for a rezoning of the property and to the County Board of Adjustment for a variance from the distance requirements. The County denied the application for rezoning and therefore had no reason to act on the variance application.

In its first opinion, *International Eateries v. Broward County*, 726 F.Supp. 1556 (S.D.Fla.1987) ("*Dollhouse I*"), the district court held that the special uses ordinances as applied to International Eateries violated the first amendment because the ordinances did not advance a substantial government interest and did not leave available alternative channels for International Eateries to conduct its business. *Dollhouse I*, 726 F.Supp. at 1566–67. As for the distance ordinances, the court held that they were not unconstitutional on their face, and that International Eateries' as-applied challenge was premature because the County had not yet ruled on the application for a variance. *Id.* at 1563–64.

International Eateries then filed a petition with the County's Building and Zoning Enforcement Division, seeking an automatic waiver of the 500–foot residential district prohibition. That ordinance states that the 500–foot requirement shall be waived upon presentment of "a written petition requesting the waiver, signed by 51 percent of all those persons owning real property, residing or operating or managing a business within 500 feet of the proposed location of the designated use." International Eateries' petition contained the names of eight persons residing or owning property in the residential district. Although this was a majority of the owners and residents of the

area, the County denied the petition because it interpreted the ordinance as also requiring signatures of operators and managers of businesses within the area. International Eateries also requested waivers of the distance ordinances from the County's Planning and Zoning Board and from the County Commission, but these requests were denied.

In June 1988, International Eateries again filed an action in district court seeking to enjoin enforcement of the distance ordinances. The district court again denied relief, this time finding the ordinances valid as applied. *International Eateries v. Broward County*, 726 F.Supp. 1568 (S.D.Fla. 1989) (*"Dollhouse II "*). International Eateries now appeals the district court's decision in *Dollhouse II.*

## II

The regulation of non-obscene[1] nude dancing often has been addressed in the federal courts. On several occasions, the Supreme Court has assumed, without deciding, that nude dancing is protected expression under the first amendment. *See Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 66, 101 S.Ct. 2176, 2181, 68 L.Ed.2d 671 (1981) ("nude dancing is not without its First Amendment protections from official regulation"); *see also Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975); *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975); *California v. LaRue*, 409 U.S. 109, 93 S.Ct. 390, 34 L.Ed.2d 342 (1972). In a related context, the Supreme Court has held that under some circumstances cities may enact zoning ordinances that require adult movie theatres to locate only in certain areas, provided that the purpose of the regulation is to control the "secondary effects" of these businesses. *See City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986); *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976). These cases have been applied by the lower federal courts to the regulation of nude dancing. *See, e.g., International Food & Beverage Systems v. City of Fort Lauderdale*, 794 F.2d 1520 (11th Cir.1986); *SDJ, Inc. v. City of Houston*, 837 F.2d 1268 (5th Cir.1988); *Envy Ltd. v. City of Louisville*, 734 F.Supp. 785 (W.D.Ky.1990).

## A

This term, the Supreme Court squarely addressed the protection afforded to nude dancing under the first amendment. In *Barnes v. Glen Theatre, Inc.*, — U.S. ——, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991), respondents sought to enjoin enforcement of Indiana's public indecency statute. Respondents contended that the statute, which prohibited "appear[ing] in a state of nudity" in a public place, was invalid as applied to the nude dancing performed at two establishments. Although the Court upheld the statute, the effect of the Court's plurality holding on our case is not readily apparent. Keeping in mind that "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds,'" *Marks v. United States*, 430 U.S. 188, 193, 97 S.Ct. 990, 993, 51 L.Ed.2d 260 (1977), we examine in greater detail the three opinions that made up the five-member majority.

Chief Justice Rehnquist, writing for Justices O'Connor and Kennedy, began his analysis by noting that the statements in *Schad, Doran,* and *LaRue* discussed above "support the conclusion of the Court of Appeals that nude dancing of the kind sought to be performed here is expressive conduct within the outer perimeters of the First Amendment, though we view it as only marginally so." *Id.* at 2460 (opinion of Rehnquist, C.J.). In order to determine "the level of protection to be afforded to the expressive conduct at issue," the opinion analyzed the statute under the four-part inquiry of *United States v. O'Brien*,

---

**1.** Obscenity is not protected by the first amendment, *see Miller v. California*, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), and is not at issue in this case.

391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968), the framework applied to symbolic speech. The second prong of that test requires that the statute further an important or substantial government interest. Although the Chief Justice's opinion noted that "[i]t is impossible to discern, other than from the text of the statute, exactly what governmental interest the Indiana legislators had in mind," the opinion nevertheless concluded that "the statute's purpose of protecting societal order and morality is clear," *Barnes*, 111 S.Ct. at 2461, and that such a purpose furthers a substantial governmental interest. *Id.* at 2462.

*O'Brien*'s third prong requires that the interest to be protected is unrelated to the suppression of free expression. Here, the opinion stated that because the statute did not prohibit nude dancing, but rather all public nudity, the statute was not intended to suppress expression. *Id.* 111 S.Ct. at 2463. Finally, *O'Brien* requires that the restriction on free expression be no greater than is essential to the furtherance of that interest. Here, Chief Justice Rehnquist concluded that Indiana's requirement of pasties and a G-string was the "bare minimum" necessary to achieve the state's interest. *Id.*

Justice Scalia concurred in the judgment, but not the reasoning, of the plurality. According to Justice Scalia, "the challenged regulation must be upheld, not because it survives some lower level of First–Amendment scrutiny, but because, as a general law regulating conduct and not specifically directed at expression, it is not subject to First–Amendment scrutiny at all." *Id.* (Scalia, J., concurring). Because the statute was not covered by the first amendment, it only needed to survive rational-basis review to be valid under the Due Process Clause—a test that was easily met according to Justice Scalia. *Id.* 111 S.Ct. at 2468.

Justice Souter, the fifth Justice to uphold the statute, agreed with Chief Justice Rehnquist's opinion that nude dancing is subject to first amendment protection, and also agreed that the statute should be analyzed under *O'Brien*. He further stated, however, that "I nonetheless write separately to rest my concurrence in the judgment, not on the possible sufficiency of society's moral views to justify the limitations at issue, but on the State's substantial interest in combating the *secondary effects* of adult entertainment establishments of the sort typified by respondents' establishments." *Id.* 111 S.Ct. at 2468 (Souter, J., concurring) (emphasis added). Justice Souter explained his difference with the plurality as follows:

It is, of course, true that this justification has not been articulated by Indiana's legislature or by its courts. As the plurality observes, "Indiana does not record legislative history, and the state's highest court has not shed additional light on the statute's purpose." While it is certainly sound in such circumstances to infer general purposes "of protecting societal order and morality ... from [the statute's] text and history," I think that we need not so limit ourselves in identifying the justification for the legislation here, and may legitimately consider petitioners' assertion that the statute is applied to nude dancing because such dancing "encourag[es] prostitution, increas[es] sexual assaults, and attract[s] other criminal activity."

*Id.* at 2469 (ellipses and brackets original, citations omitted). The only legally significant difference between the opinions of the Chief Justice and of Justice Souter is the societal interest viewed as sufficient to allow the government regulation. Thus, in applying the second prong of *O'Brien*— furtherance of a substantial government interest—according to the plurality, society has a substantial interest in protecting order and morality; according to Justice Souter, morality may not be a substantial government interest, but combatting the secondary effects of adult entertainment establishments is. As for the third prong, content neutrality, the plurality found that the statute was neutral because it was aimed at all public nudity, rather than only nude dancing; Justice Souter found this prong satisfied because the statute is aimed at secondary effects, rather than at nude dancing itself.

■ Prior to *Barnes*, our decision would have been guided by the secondary-effects analysis of *Renton*, 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986). Having examined the opinions in *Barnes*, we conclude, for two reasons, that this is still the case. First, Justice Souter, whose vote was necessary to uphold the statute, stated that morality justifications were not a substantial government interest, but that control of secondary effects did constitute such an interest. Thus, in order to uphold a statute regulating nude dancing, it is still necessary after *Barnes* that the statute meet the secondary effects test of *Renton*.

Second, the statute at issue in *Barnes* and the ordinance at issue in this case are different in a significant respect. In *Barnes*, the statute prohibited all public nudity, regardless of its expressive content. Here, Broward County's distance ordinances only apply to "designated uses," which include the "adult nightclub" involved in this case. Justice Scalia, whose vote was also necessary to uphold the statute in *Barnes*, based his analysis on the "general" nature of the statute and specifically noted that "[w]here the government prohibits conduct *precisely because of its communicative attributes*, we hold the regulation unconstitutional." *Barnes*, 111 S.Ct. at 2466 (Scalia, J., concurring) (emphasis original). Thus, Justice Scalia's analysis would not apply to a statute like the one in this case that singles out nude dancing rather than broadly prohibiting all public nudity.

Although this discussion does not explain how the Supreme Court would rule in the instant case, it does make clear that the judgment reached by a majority of the Justices in *Barnes* does not directly govern our case. This being so, we conclude that *Renton* still controls our analysis.

### B

In *Renton*, the Supreme Court addressed the validity of an ordinance that prohibited adult motion picture theaters from locating within 1,000 feet of any residential zone, single- or multiple-family dwelling, church, park, or school. Relying on *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976), which upheld a zoning ordinance that limited the showing of adult films to certain locations, the Court noted that "zoning ordinances designed to combat the undesirable secondary effects of such businesses are to be reviewed under the standards applicable to 'content-neutral' time, place, and manner regulations." *Renton*, 475 U.S. at 49, 106 S.Ct. at 929–30. The Court stated that the inquiry, therefore, was whether "the ordinance is designed to serve a substantial governmental interest and allows for reasonable alternative avenues of communication." *Id.* at 50, 106 S.Ct. at 930.[2]

Before applying this test, we note that although the Court in *Renton* stated the

---

**2.** It might be argued that because we are addressing a regulation of nude dancing, as was the Court in *Barnes*, rather than a regulation of motion pictures, as was the Court in *Renton*, we should apply the *O'Brien* "symbolic conduct" analysis rather than the Court's "time, place, and manner" analysis. In *O'Brien*, the Court stated that a statute regulating symbolic conduct was valid

> if it is within the constitutional power of the Government; if it furthers an important or substantial government interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

*O'Brien*, 391 U.S. at 377, 88 S.Ct. at 1679.

There has been considerable confusion in the Court's cases as to when each analysis should apply. In recent years, however, the Court has stated several times that "in the last analysis [the *O'Brien* test] is little, if any, different from the standard applied to time, place, or manner restrictions." *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 298, 104 S.Ct. 3065, 3071, 82 L.Ed.2d 221 (1984); *see also Barnes*, 111 S.Ct. at 2460 (opinion of Rehnquist, C.J.) (noting the similarities and applying *O'Brien*); *Ward v. Rock Against Racism*, 491 U.S. 781, 109 S.Ct. 2746, 2757, 105 L.Ed.2d 661 (1989) (noting the similarities and applying time, place, and manner analysis). Although the wisdom of this trend toward a single standard has been questioned, *see* S. Williams, *Content Discrimination and the First Amendment*, 139 U.Pa.L.Rev. 615, 636–54 (1991), it is sufficient for our purposes that the Supreme Court has determined that under current Court doctrine the answer should be the same regardless of which analysis is used. Because we conclude that the ordinance

inquiry as containing two elements (serving a substantial government interest and allowing for reasonable alternative avenues of communication), the Court's time, place, and manner cases generally have required a third element: the regulation must be narrowly tailored to serve the government interest at issue. In fact, when the *Renton* Court enunciated the test as containing two parts, it cited two cases, both of which addressed the narrow-tailoring requirement. *See Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293–96, 104 S.Ct. 3065, 3069–70, 82 L.Ed.2d 221 (1984); *Heffron v. International Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 654, 101 S.Ct. 2559, 2567, 69 L.Ed.2d 298 (1981). Moreover, the Court has required the narrow-tailoring element in cases decided after *Renton*. *See, e.g., Ward v. Rock Against Racism*, 491 U.S. 781, 109 S.Ct. 2746, 2756–60, 105 L.Ed.2d 661 (1989); *Frisby v. Schultz*, 487 U.S. 474, 108 S.Ct. 2495, 2502–04, 101 L.Ed.2d 420 (1988). Finally, although the *Renton* Court did not specifically include narrow tailoring in its formulation of the standard to be applied, the Court later examined "the method chosen by Renton to further its substantial interests," and found that that method was "narrowly tailored" to further the government interest in that case. *Renton*, 475 U.S. at 52, 106 S.Ct. at 931. Thus we do not believe that the *Renton* Court intended to eliminate the narrow-tailoring requirement from time, place, and manner analysis, and we therefore consider that requirement in our analysis below.

## III

### A

■ We first address whether Broward County's ordinances further a substantial government interest. In *Renton*, the Court recognized that a city's interest in protecting the quality of urban life from the secondary effects of adult businesses is indeed substantial. *Renton*, 475 U.S. at 50, 106 S.Ct. at 930. The distance ordinances prohibit the location of an "adult nightclub" within 500 feet of a residentially zoned district or 1000 feet of a church. The ordinances also specifically state that certain businesses have a "deleterious effect" on the residential and business areas around them and that the purpose of the ordinance is to "ensure that these adverse effects will not contribute to the blighting and downgrading of the surrounding neighborhood." Thus, the ordinances are aimed at the very type of harm that the *Renton* Court found to create a substantial government interest.[3]

The *Renton* Court also recognized, however, that the enacting body must have a reasonable basis for its belief that the harm to be protected against in fact exists. The city need not conduct its own studies to make this determination. According to the Court:

The First Amendment does not require a city, before enacting such an ordinance, to conduct new studies or produce evidence independent of that already generated by other cities, so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses.

*Id.* at 51–52, 106 S.Ct. at 931. Here, the district court found that Broward County relied on the experiences of Detroit in enacting its ordinances. Detroit's distance ordinances were upheld in *Young v. American Mini Theatres.* International Eater-

at issue in this case more closely resembles the ordinance in *Renton* than the statute in *Barnes*, we follow *Renton* and apply time, place, and manner analysis.

**3.** Justice Souter, the only Justice to rely on *Renton* in *Barnes*, found that secondary effects were a substantial government interest despite the fact that the statute was silent as to its purpose. *See Barnes*, 111 S.Ct. at 2469 ("It is, of course, true that this justification has not been articulated by Indiana's legislature or by its courts."). The ordinance at issue in *Renton* specifically stated that adult businesses "would have a severe impact upon surrounding businesses and residences." *Renton*, 475 U.S. at 44, 106 S.Ct. at 927. Because Justice Souter wrote only for himself in *Barnes*, we continue to follow the *Renton* Court's approach of gleaning the government interest at stake from the ordinance itself rather than implying one where none is evident in the ordinance.

ies argues, however, that because the County's ordinances were not modeled exactly after those of Detroit, Detroit's studies should not suffice to justify the County's ordinances. The Supreme Court answered this argument in *Renton*:

> Nor is our holding affected by the fact that Seattle ultimately chose a different method of adult theater zoning than that chosen by Renton, since Seattle's choice of a different remedy to combat the secondary effects of adult theaters does not call into question either Seattle's identification of those secondary effects or the relevance of Seattle's experience to Renton.

*Renton*, 475 U.S. at 52, 106 S.Ct. at 931. We therefore conclude that Broward County's distance ordinances further a substantial government interest.

## B

■ We next address whether the distance ordinances are narrowly tailored to further the County's interest in combatting the secondary effects of adult entertainment establishments. In *Renton*, the Court stated that the ordinance was narrowly tailored because it affected "only that category of theaters shown to produce the unwanted secondary effects...." *Renton*, 475 U.S. at 52, 106 S.Ct. at 931. Here, the ordinances are of a similarly limited scope, focusing only on those businesses likely to produce secondary effects.

International Eateries argues, however, that there is no indication that a single nude dancing establishment causes deterioration of the surrounding area. According to International Eateries, the ordinances are designed to prevent the concentration of such establishments. While it is true that the ordinances prohibit the location of an adult nightclub within 1,000 feet of another adult business, the ordinances are not only concerned with concentrations of adult establishments. The ordinances separately prohibit adult businesses from locating near other uses such as residential areas, churches, and schools. The County obviously determined that even a single adult business could have deleterious effects on these property uses. So long as the distance requirements are not greater than necessary to prevent the secondary effects, they are narrowly tailored to serve their purpose. In this case, the distances required by the ordinances are no farther than those approved by the Court in *Renton*; thus we cannot say the requirements are not narrowly tailored.

International Eateries further argues that there is uncontradicted evidence in the record that Thee Dollhouse III has not in fact caused any adverse effects on surrounding property values and that property values have actually increased at a higher rate than before the opening of Thee Dollhouse III. This argument holds no weight. As discussed above, Broward County appropriately tailored its distance ordinances to further its substantial government interest. If the decision was valid ex ante, International Eateries cannot justify violating the ordinances by showing that they were unwise ex post.

■ International Eateries also challenges the waiver provision of the residential distance requirement. That provision allows the residential distance requirement to be waived upon presentment of a petition signed by "51 percent of all those persons owning real property, residing or operating or managing a business within 500 feet of the proposed use." Although International Eateries presented a petition containing the signatures of a majority of those persons owning real property or residing within 500 feet of Thee Dollhouse III, the County interpreted the ordinance as requiring a majority of all the persons listed in the provision and therefore denied the waiver request.

International Eateries contends that the waiver provision is not narrowly tailored because the ordinance is designed to protect property values of residents, yet it allows businesses to block a waiver. International Eateries notes that if residential property was not located in the vicinity, those businesses would have no right to object to the location of the establishment. Thus, according to appellant, it is absurd to allow an unprotected group to thwart the

waiver when a majority of the very group the ordinance was designed to protect has given its consent.

We are unpersuaded by this argument. First, appellant has pointed to no authority indicating that the County is even required to provide a waiver opportunity. The Court in *Renton* upheld similar distance requirements and made no mention of any opportunity for a party to have the requirements waived. Also, the other ordinance at issue in this case, the church distance requirement, does not have a waiver provision, and International Eateries has not argued that one is required. Thus, we fail to see how a valid distance requirement can become invalid by adding an opportunity, albeit a difficult one to meet, for the requirement to be waived.[4] Moreover, the fact that the ordinance prohibits adult entertainment within 500 feet of a residential area does not mean that the ordinance is concerned only with residents. The ordinance specifically addresses the secondary effects of adult businesses "upon the adjacent *business* and residential areas" (emphasis added). Certain businesses are more likely to locate near residential areas than are other businesses, and those businesses may be more likely to be injured by the proximity of adult entertainment. The County was entitled to take this into account.[5]

Finally, International Eateries argues that the church distance ordinance is not narrowly tailored because it has a distance requirement of 1,000 feet, and the County has not provided a sufficient justification for why the requirement needs to be twice the distance of the 500–foot residential requirement. International Eateries points to *Walnut Properties, Inc. v. City of Whittier*, 808 F.2d 1331 (9th Cir.1987), to support its argument. That opinion arose out of a dispute involving an ordinance, like the one at issue in this case, that prohibited the location of an adult business within 1,000 feet of a church. The district court originally held that the ordinance was invalid, and the Ninth Circuit affirmed. *Walnut Properties, Inc. v. City of Whittier*, 762 F.2d 1020 (9th Cir.1985). The Supreme Court, however, issued its opinion in *Renton* shortly thereafter and then remanded the case for reconsideration in light of *Renton*. *City of Whittier v. Walnut Properties, Inc.*, 475 U.S. 1042, 106 S.Ct. 1255, 89 L.Ed.2d 566 (1986). The opinion cited by International Eateries was the order by the Ninth Circuit remanding the case to the district court. In its instructions to the district court, the court stated: "[T]he City's interest in preventing urban blight and downgrading of residential and commercial properties might logically support the ordinance's requirement that adult businesses be 1,000 feet apart, but it might not support the requirement that they be 1,000 feet from a church." *Walnut Properties*, 808 F.2d at 1335. This statement was merely one of several comments made by the court to guide the district court's analysis. The court was not ruling on the church distance

---

4. Of course, a waiver provision that allowed for arbitrary enforcement would be invalid. *See City of Lakewood v. Plain Dealer Publishing, Co.*, 486 U.S. 750, 108 S.Ct. 2138, 2143, 100 L.Ed.2d 771 (1988) ("[I]n the area of free expression a licensing statute placing unbridled discretion in the hands of a government official or agency constitutes a prior restraint and may result in censorship."); *see also Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 150–51, 89 S.Ct. 935, 938, 22 L.Ed.2d 162 (1969). In this case, however, the waiver provision leaves no room for arbitrary enforcement. It specifically states that a waiver "shall" be granted upon the presentment of the requisite number of signatures.

5. International Eateries also argues that the County improperly interpreted the waiver provi-

sion. According to International Eateries, the use of the term "or" in the provision indicates that a majority of any of the groups listed in the provision is sufficient to obtain a waiver. We have no power to decide this issue. The interpretation of the County ordinance is purely a matter of state law. So long as the County applies the ordinance consistently, we are empowered only to determine whether that interpretation withstands constitutional scrutiny. *See Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 65, 101 S.Ct. 2176, 2181, 68 L.Ed.2d 671 (1981); *Heffron v. International Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 643, 101 S.Ct. 2559, 2562, 69 L.Ed.2d 298 (1981); G. Gunther, Constitutional Law 1153 n. 11 (11th ed. 1985).

requirement. After remand to the district court, the district court again held the ordinance invalid, and the Ninth Circuit affirmed. *Walnut Properties, Inc. v. City of Whittier,* 861 F.2d 1102, 1107–10 (9th Cir. 1988), *cert. denied,* 490 U.S. 1006, 109 S.Ct. 1641, 104 L.Ed.2d 157 (1989). The appellate court specifically limited its holding, stating that it was based entirely on the fact that there were not adequate alternative locations in the city for adult businesses. *Id.* Thus, contrary to International Eateries' assertion, the case does not stand for the proposition that a 1,000–foot church distance ordinance is excessive. Rather, the case simply follows the *Renton* analysis, holding that where there are not sufficient alternative locations, an ordinance zoning adult businesses is invalid. We therefore hold that in this case the ordinances are narrowly tailored to serve their purpose.

### C

■ Finally, unlike the ordinance in *Walnut Properties,* the Broward County ordinances allow for reasonable alternative avenues of communication. It is undisputed that there are twenty-six other sites in unincorporated Broward County where International Eateries could locate an adult entertainment establishment without violating the distance ordinances. International Eateries does not argue that the ordinances are invalid in this respect.

### IV

In view of the above discussion, we hold that the Broward County distance ordinances are valid under the Supreme Court's analysis in *Renton.*

AFFIRMED.